The next case this morning is 522-0125, People v. Witcher. Arguing for the defendant appellant is Julie Thompson. Arguing for the appellee state is Victoria Joseph. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning. Good morning. Ms. Thompson, are you ready to proceed? I am ready, Your Honor. You may proceed. May it please the court and counsel, my name is Julie Thompson. I work for the Office of the State Appellate Defender. I am here today representing Brady Witcher in his direct appeal to this court. Mr. Witcher was charged and convicted in Madison County, Illinois, with three counts of murder in the shooting deaths of Sherry Yates, Andrew Brooks, and John McMillan, which occurred in Bethalto, Illinois. Brittany McMillan was also charged in a separate case with the same murder. She ultimately pled guilty. Prior to Mr. Witcher's jury trial and over counsel's objection, the trial court allowed the state's motion to admit evidence of other crimes that Mr. Witcher had been involved in prior to the Bethalto homicides. The evidence at trial that the jury heard came from Jessica Graves, who testified that she and Brittany McMillan had been friends for years, and had lived in an apartment with Mr. Witcher for about a month before there had developed a problem that resulted in Ms. McMillan and Mr. Witcher becoming very upset with Ms. Graves. Ms. Graves testified that McMillan sat her down on the sofa, told her that she was going to pay for what she had done, and while Mr. Witcher held a gun pointed at her head, McMillan took a pair of pliers and tried to cut her finger off. Her finger did not sever, but became very bloody, and ultimately they decided to wrap her hands in a garbage bag that they duct-taped together and zip-tied. Mr. Witcher then proceeded to take Ms. Graves, place her in the bedroom closet after pistol-whipping her, and zip-tying her feet and hog-tying then her hands and feet together behind her back. Ms. Graves testified that Mr. Witcher also took an uninflated air mattress and placed her in it and zip-tied her in it like a taco. She testified that prior to being placed in the closet, Ms. McMillan had put a gun in her mouth, pointed it at her head, shot her up with narcotics, and put a cigarette out on her. Finally, before they closed the door of the closet, Ms. McMillan gave Mr. Witcher a bleach-soaked rag that he stuffed into Ms. Graves' mouth and duct-taped to her head. Ms. Graves testified that she was in that closet overnight, and that sometime the next day she heard Mr. Witcher and Ms. McMillan saying that they were leaving the apartment to go to Walmart. As soon as she heard the door slam, she was able to break her feet loose of the zip-ties. That allowed her to get to her feet. She escaped from the air mattress and was able to get out of the closet. She poked her fingers through the garbage bag that was tying her hands, got into a backpack, found an old cell phone, and was able to call 911. Then she heard Ms. McMillan's voice again, so she hid in the bathroom until Ms. McMillan had left. Then she tried to leave the apartment, but someone grabbed her and tried to get her back into the closet. She pepper-sprayed that person, and unfortunately pepper-sprayed herself. She was unable to see, but managed to get to the front door of the apartment, get it open, and then fell down two flights of stairs, where she was ultimately rescued by the police. The jury then heard testimony from Diego Padron, who testified that he and his wife resided in an apartment complex in Clarksville, Tennessee. They were laying down in bed preparing to leave later that evening when Mr. Padron saw shadows on the wall in his apartment building. He got up to investigate, and there was a man and a woman both with pistols, and they pointed them at his face. They took the Padrons, both Mr. and Mrs. Padron, and tied them up using cables and wires from the playstations and televisions in the bedroom, and again, put them in the closet. They then, Mr. Witcher and Ms. McMillan, went through items of personal property, remained in the Padron's apartment for in excess of probably about 12 hours, would check on Mr. and Mrs. Padron in the closet on occasion. Mrs. Padron had been hog-tied similarly to Ms. Graves. Mr. Padron was zip-tied with his hands behind his back, but he was able to get those released. He pretended that he was still tied up when they came to check on him. Ultimately, sometime the next morning, the man came, Mr. Witcher, to the closet and told Mr. Padron that they were going to put him in the back room, and then they were going to leave. Mr. Witcher removed the zip-ties from Mr. Padron's hand, stuck a sock in his mouth and duct-taped it, wrapped a shirt around his head and covered his eyes so that he couldn't see where he was going, and then led him into the bathroom and told him to get on his knees. When Mr. Padron got on his knees, Mr. Witcher took one of the Padron's kitchen knives and proceeded to stab Mr. Padron in the head and back approximately 12 times.  Mr. Witcher then left the bathroom. Mr. Padron was able to get his hands completely freed and in front of him by pulling his legs through with the zip-tied hands and was able to stand up. Mr. Witcher heard him and came back into the bathroom, told him to get back on his knees. Mr. Padron refused and stepped closer to Mr. Witcher, which resulted in Mr. Witcher then stabbing Mr. Padron's wrists, trying to get him to lay back down. Mr. Padron decided that he did not believe that Mr. Witcher wanted to use the gun that he had because of the noise that it would make, so Mr. Padron grabbed the gun. There was a struggle and the gun went off. No one was shot, but Mr. Padron was able at that point to knock Mr. Witcher down. He tripped over the piles of property that he had been firing up in the bedroom. Mr. Padron and Mr. Witcher continued to struggle until Mr. Padron saw that his wife had come out of the closet and had run out of the apartment, at which point Mr. Padron also left the apartment, ran out in an opposite direction from his wife. He ran into the woods near the apartment. He was able to pack the bloody wounds that he had with mud to stop the bleeding. He went back into the apartment complex, knocked on doors until he found someone to call the police to help him. Mrs. Padron also testified, testified similarly to her husband, and testified that once her husband was removed from the closet and she heard the gurgling noises that he made, and then she heard the gunshot, and then she heard him screaming that they're trying to kill us, she came out of the closet and attacked the woman who was standing there holding the gun and watching Mr. Witcher struggle with her husband. She was able to get the gun away from the woman and actually pointed the gun at the woman and fired it because the gun did not discharge. At that point, Mrs. Padron ran out the apartment door, followed thereafter by her husband. She didn't see her husband again until he was at the hospital. Mr. Padron testified that he received some serious injuries, including facial scars from when Mr. Witcher had tried to cut his throat and nerve damage to the hand that had been stabbed. Evidence of other crimes is admissible. When those other crimes bear some connection to the crime charged or there is an issue that links the two. However, evidence of other crimes is not admissible when it is offered to show only a propensity to commit crimes or when it is only for the purpose or when its prejudicial effect outweighs its probative value. Evidence is prejudicial when it leads to a decision that is based on hatred, contempt, or horror, and the trial court is to prohibit many trials from occurring in the trial court on other crimes. It is difficult when listening to the evidence that was presented about the crimes in Alabama and Tennessee to decide what possible other evidence the state could have presented to actually obtain convictions against Mr. Witcher for those crimes. The state introduced evidence of identity, venue, use of force, weapons, illegal entry into a home, theft, physical injury, illegal restraint, including physical evidence of DNA and ballistics to support the testimonial evidence from the Alabama and Tennessee offenses. Compared to that, the court allowed 386 exhibits that were introduced by the state. 107 of those exhibits dealt only with the offenses in Alabama and Tennessee. We've cited three cases in our brief that indicate that overwhelming evidence of guilt does not prevent the appellate court from reversing a conviction when detailed and excessive evidence of other crimes is admitted, that the trial court is not to allow evidence at great length and with extraordinary specificity of other crimes, as it did here on both the crimes in Alabama and in Tennessee. Ms. Thompson, are you familiar with the case cited by the state of People v. Hale? Yes. 326 L. App III 455. That case seems similar to me. How do you distinguish that case? I think it's just the severity of the evidence and the excessive detail of the evidence that the state admitted here in these two cases. The testimony from Mrs. Padron about the bedsheets that were taken from her home, things of that nature, it was just incredibly detailed and excessive amounts of evidence on the Tennessee and Alabama crimes, and it just was not necessary to prove any connection between the Illinois homicide and the Alabama and Tennessee offenses. The other thing with this is that there was very limited evidence, physical evidence, on the Bethalto homicides that connected Mr. Witcher to those offenses. There was no DNA evidence, although there was in the Tennessee case, connecting him to those offenses. Thank you. Ms. Thompson, wasn't there a vehicle taken in one of those, and that vehicle was found in the St. Louis area? Where was it found? There was, Your Honor. There was a vehicle taken. Mr. Padron's pickup truck was taken from Tennessee, and that is the vehicle that was driven to Illinois and was subsequently discovered, I think, in the- That connects that case with the other case. That connects the case to the Bethalto homicide because of the vehicle. Yes. Then how did the homicide in Bethalto, wasn't there a vehicle taken there too? There was a- Was that the same vehicle as one of the owners of the vehicle was murdered, one of the victims? Yes. The female, Sherry Yates, that was murdered in Illinois, there was a blue Ford Fusion that she owned that was taken by Witcher and McMillan and subsequently discovered when they checked into a Days Inn hotel. Wasn't there a driver's license found someplace? There was a driver's license. Sherry Yates' driver's license was found in Mr. Witcher's wallet, yes, sir. Okay. Yes. However, when we look at the three cases that we cited, Big Penn, Ritchie, and Nunley, in those particular cases, the defendant's guilt was overwhelming. The evidence of his guilt in the charged homicide was overwhelming, and the court still reversed because of the excessive and extreme amount of other crimes evidence that was allowed in. Thank you. My time is up, Your Honors. Thank you. Other questions, Justice Welch? No, no further questions. Justice McHaney? No questions. All right. Thank you. We have time for rebuttal. Ms. Joseph? Good morning, Your Honors. May it please the court, counsel. I am Victoria Joseph, and I represent the people of the state of Illinois. Here we have other crimes evidence that was admitted at trial. As Your Honors know, this is being reviewed for an abuse of discretion, so this court should not reverse unless it is arbitrary, fanciful, or unreasonable. That also means that reasonable minds can actually disagree, and it can still be affirmed. Here the trial court conducted a pretrial hearing, considered all of the proffered evidence from the state, and weighed the probative value against its prejudicial effect. The contextual relevance of the other crimes evidence here, especially as it related to identity, motive, and to explain otherwise inexplicable acts, coupled with the trial court conducting a meaningful assessment of this evidence against its prejudicial effect, and that it limited the scope, nature, and extent of the proffered evidence, shows that this was not an abuse of discretion. The trial court did limit the details and extent of the other crimes evidence here. It excluded the most prejudicial, extreme, and heinous evidence of the murder of Kelly Hughes in Alabama. It also excluded the existence of a criminal enterprise between the co-defendants to commit crimes, and that included the robbery and chase in Nashville that actually led the co-defendants to the Padron's house in Clarksville. It did allow Graves to testify that she knew the co-defendants and linked the gun to the defendant. It permitted additional details, not because of propensity, but because it went to Graves' credibility and bias as a testifying witness. So it was admitted for a reason other than propensity. The Tennessee incident was admissible because it occurred within a day of the charge defense. As your honors pointed out, the Tennessee truck was observed at the location of the Illinois murders. The Padrons could identify the two guns used by the co-defendants. DNA and the gun that was found in the motel came back to Diego Padron. The Padron's IDs were in the defendant's wallet along with Yates' ID. So motive identification and tying the guns to both crime scenes was what that was coming in for. Also, the other crimes evidence here was not the same as the charged crime or worse than the charged crime. The court specifically did not allow the prior murder of Hughes because it was illegal. Because we had no evidence of murder in the other crimes evidence, the jury was not permitted to hear about any other murder. And the tendered instructions on murder then prohibited the jury from finding him guilty based on the other acts in Alabama or Tennessee. Also, we know that the court ruled on this in a motion in limine. It was entirely proper for the trial court comments in the post-trial motion. It demonstrated that the trial court was acutely aware of its duty to keep reconsidering the other crimes evidence as it came out in trial and to continue to weigh the probative value against the prejudicial effect. It specifically found it was almost more surprised by how intricately linked all of the evidence was, therefore, finding it very probative. And that is why it did not alter its previous rulings. As far as the instructions go, the people recognized there were instruction differences mid-trial versus end-of-trial. However, number one, the court, again, is allowed in limine to keep reconsidering the admission. None of the reasons that it was instructed in either place were inadmissible reasons, and they all could be considered. Quintero is also an example of where the court reconsidered evidence during trial. It expressed concern about the modus operandi, found it was a close case, and actually reconsidered that there were sufficient similarities for identity. So during the trial, the court only instructed on modus operandi versus at the jury instructions, both modus operandi and identity were included in the instruction. Also, defendant's citation to the King case in their reply brief, even though the court found that even though the wrong purposes were cited in the rules there, it affirmed the conviction because it was still given a limited instruction. The jury could not consider the evidence for propensity. Here, the other crimes evidence identified the defendant as we address in our brief below in the trial court, defendant argued that it was McMillan who went into the house and shot those three people. So the other crimes evidence here, identify the defendant introduced a motive in striking similarity to this court's case in Hale and explain the inexplicable, entering someone's home, shooting three people there execution style, and then taking their car. The people did not have to present a case with holes or sanitize the defendant's behavior. And the inexplicable shooting of these occupants of the Yates residence absence, the other crimes evidence would bolster the defendant's defense that McMillan did it. And the people would have been unable to provide the theory as to why the defendant himself shot those three people. If your honors thinks that the evidence allowed in this case was too much, the people maintain it was harmless error. As justice Welch pointed out in the descent in Lendley, that was a harmless error case in what is ostensibly also a circumstantial evidence case. However, here it was not just a case of circumstantial evidence where you had the ballistics tying the gun. The defendant admitted was his to both crime scenes and the, the shooting of the three people killed here, as well as the defendant's admission to deputy Hayden Lee, that he was the one that killed the three people in Beth Alto. Do your honors have any questions? I should just as well. No questions. Just as McCain. No questions. All right. Thank you. We ask your honors to affirm the defendant's conviction. Thank you. Thank you. Ms. Thompson rebuttal. Just briefly, your honors. The state's argument with regard to the instructions that the jury received, the jury did not receive any instruction with regard to modus operandi. The court originally indicated it was going to allow this evidence. Or knowledge motive, continuing narrative and bias or prejudice. The court then gave a limiting instruction before grace testified, indicating that this testimony was limited to the defendant's intent, motive, or knowledge. Gave that same instruction between the testimony of the two padrones. And then at the end of the trial in the written jury instructions told the jury that it was for identification, intent, motive, or knowledge. It was a continuously. Moving. Target. That the court was using for the reasons. For the admissibility of this evidence. Our argument primarily is focused on. Not that this was error to allow the evidence, but that it was error to allow the quantity and the detail and the excessive. Testimony with regard to the crimes in Alabama and Tennessee. That is the reason. So what's your. What's your response to the state's. Placing significance on the fact that the trial court excluded the huge murder. Doesn't that show that the court. Properly exercised his discretion. I think that it does show the court exercise properly as discretion with regard to the Hughes murder. Yes. Not necessarily with regard to the other decisions that the court made, but yes, with regard to keeping out evidence of. The Hughes murder. I believe that the court did properly exercise its discretion. The court. Did not exercise its discretion sufficiently when it allowed. 107 exhibits and photographs and eight different witnesses to testify. With regard to the crimes allegedly committed in Alabama and Tennessee. Ultimately, what happened is that this jury heard, just like this court heard. A huge quantity of evidence about crimes that were committed in Alabama and Tennessee, and there was no way for this jury to parse that out based on limiting instructions. Also the cases that we have cited in support of our argument, but they can Nunley and Richie cases. All specifically indicate that limiting instructions do not. Reduce or eliminate prejudicial error. When the court allows too much evidence of other crimes to be allowed. That is essentially the focus of our argument here. It was excessive. Not that the court shouldn't have, or did not have discretion or the law was not supportive. I agree with counsel in the sense that reasonable people can disagree on whether or not this should have been admissible, but what we can't disagree on is that the excessive nature of this testimony. Over and over and over details about. Bedsheets and Kevlar vests and items that were allegedly taken from the household. There's no connection to the homicides in Bethel toe. It was just too much. And the jury cannot reasonably be expected to have parsed those out. And essentially. Effectively applied those limiting instructions. There's just too much of it. Thank you. Thank you, Miss Thompson. It's a very interesting case. We appreciate your arguments. We will take the matter under advisement and issue a decision in due course.